**FOR THE UNITED STATES DISTRICT COURT
IN THE DISTRICT OF NEW MEXICO**


DOMINGO GOMEZ

     Plaintiff,

v.                                                          No. 12-1067 GBW/WPL

BENJAMIN MARTIN *et al.*

     Defendants.

## <u>ORDER</u>

This matter is before the Court on Defendant Benjamin Martin's Motion for

Qualified Immunity and Summary Judgment. *Doc. 47 & 48.*   The Court, having

reviewed the Motion and accompanying briefing, *docs. 62 & 65*, will GRANT it.

## I.   BACKGROUND

Plaintiff Domingo Gomez brings this action under 42 U.S.C. § 1983 and New

Mexico state law against Defendants Myrna Gomez, his former wife, her mother

Defendant Bellia Armendariz, and Defendant Benjamin Martin, an investigator with the

Dona Ana County Sheriff's Office (DASO) at the time of the events in question.  *Doc. 32.*

The Clerk has entered default against Defendants Gomez and Armendariz.  *Docs. 11, 12.*

In September 2008, Defendants Gomez and Armendariz reported to DASO

Deputy Valerie Montoya that they suspected that Plaintiff had poisoned each of them:

Defendant Armendariz on January 10, 2008, and Defendant Gomez on at least two

separate occasions, February 22 and March 6, 2008.  *Doc. 32* at 2-3.  Defendant Martin

investigated the claims on behalf of DASO.  *Id.*  On July 27, 2010, Plaintiff was charged

with attempted murder as a result of Defendant Martin's investigation.  *Id.* at 3.  On

May 25, 2012, the Doña Ana County Deputy District Attorney filed a dismissal of all

charges *nolle prosequi.*

Plaintiff contends that Defendants Gomez and Armendariz fabricated these

accusations of poisoning and that Defendant Martin wrongfully pursued a criminal

action for attempted murder against him despite a lack of credible evidence to support

a prosecution. *Id.* at 1, 3.  Plaintiff asserts that in some cases Defendant Martin falsified,

and in other cases omitted, material facts when presenting evidence relating to the

criminal complaint to the court and during his grand jury testimony. *Id.* at 3-7.

Plaintiff filed the instant action on October 17, 2012.  *Doc. 1.*  His Second

Amended Complaint alleges that Defendant Martin is liable for both malicious

prosecution and false imprisonment arising from his faulty probable cause

determination and subsequent arrest of Plaintiff.  *Doc. 32* at 9.  On May 6, 2013, the

action was stayed by agreement of the parties. *Doc. 42.*  Defendant Martin filed the

Motion for Summary Judgment on the Basis of Qualified Immunity on June 12, 2013.

*Doc. 47.*

## II.   STANDARD OF REVIEW

### A.   Summary Judgment

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). All material facts set forth in the motion and response which are not specifically controverted are deemed undisputed. D.N.M.LR-Civ. 56.1(b).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  *See Liberty Lobby*, 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999).  Third, the court cannot decide any issues of credibility.  *See Liberty Lobby*, 477 U.S. at 255.  "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor."  *Id*. at 257.

## B.      Qualified Immunity

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Although Plaintiff, rather than Defendants, filed this motion, Defendants have asserted qualified immunity in their response.  *Doc. 83* at 7.  "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff who must clear two hurdles to defeat the [defense].  The plaintiff must demonstrate, on the facts alleged, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the

time of the alleged unlawful activity." *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (citations omitted).

**III.   UNDISPUTED FACTS**

1.  At all times material to the complaint, Defendant Martin was employed by DASO.  *Doc. 48*, Ex. 1 ¶ 3, *doc. 62* at 3.

2.  On January 10-11, 2008, Defendant Armendariz fell ill, reporting symptoms of nausea, vomiting, and abdominal pain. She was taken to Memorial Medical Center (Memorial), where she reported vomiting a "greenish substance." She was ultimately diagnosed with abdominal pain, nausea, vomiting, and acute cystitis.  *Doc. 48*, Ex. 1 ¶¶ 42-45, *doc. 62* at 7, Ex. 1.

3.   On February 7, 2008, Defendant Gomez fell ill and received treatment from paramedics. *Doc. 48*, Ex. 1 ¶ 36, *doc. 62* at 6.

4.  On February 23, 2008, Defendant Gomez fell ill and was taken to Memorial, where she presented with acute respiratory failure and a variety of other lung and heart ailments and other non-specific physical symptoms, as well as depression, anxiety, and fear of both Defendant Armendariz and Plaintiff. She was discharged on February 25, 2008 *Doc. 48*, Ex. 1 ¶¶ 37-39, *doc. 62* at 6-7.

5.  On September 26, 2008, Defendants Gomez and Armendariz reported to DASO Deputy Valerie Montoya that they believed that Plaintiff had attempted to poison them on several separate occasions earlier that year.  Defendants reported

5

the dates of these events as January 10, 2008, February 22, 2008, and March 6,

2008.  Defendants Gomez and Armendariz reported that Plaintiff had attempted

to poison them through tampering with their beverages as well as Defendant

Gomez's hair products and probiotic pills.  *Doc. 48*, Ex. 1 ¶ 7, *doc. 62* at 3.

6.  Defendant Martin was assigned to the case and investigated Defendants Gomez

    and Armendariz's allegations of poisoning. *Doc. 48*, Ex. 1 ¶ 6, *doc. 62* at 3.

7.  As part of his investigation, Detective Martin interviewed Plaintiff and

    Defendant Gomez's two minor children on October 2, 2008.  During Detective

    Martin's interview with Alejandro Gomez, age 10 at the time, Alejandro stated

    that he overheard Plaintiff on the phone with a third party discussing poisoning

    Defendant Gomez and that he had seen Plaintiff putting a small brown pill into a

    beverage prepared for Defendant Gomez.  *Doc. 48*, Ex. 1 ¶¶ 7-9, *doc. 62* at 3-4.

8.  Also on October 2, 2008, Defendant Martin interviewed Defendant Gomez.

    During that interview, Defendant Gomez reported a variety of incidents,

    including the fact that she became ill on several occasions after consuming

    beverages given to her by Plaintiff, and Defendant Armendariz had also become

    ill after consuming a beverage provided by Plaintiff.  She also reported becoming

    so ill on one occasion that she was hospitalized. *Doc. 48*, Ex. 1 ¶¶ 12-13, *doc. 62* at

    4.

9.  On April 20, 2009, Defendant Martin sent a bottle of wine allegedly adulterated by Plaintiff to NMS Labs to be tested for controlled substances and pharmaceuticals.  The testing revealed the presence of carbofuran, a tightly regulated chemical commonly found in insecticides. *Doc. 48,* Ex. 1 ¶¶ 14-16, *doc. 62* at 4.

10. On June 2, 2009, Defendant Martin, along with another investigator from DASO, interviewed Defendants Gomez and Armendariz both together and separately. During the interviews, Defendant Martin learned that Plaintiff worked for Don Hackey Farms.  Defendants Gomez and Armendariz also gave detailed accounts of five separate instances on which they fell ill between January 10 and March 6, 2008.  Four of these incidents occurred after Plaintiff served Defendants beverages, and one involved the consumption of an allegedly adulterated probiotic pill, which appeared to Defendant Gomez to be off-colored and unusually porous.  *Doc. 48*, Ex. 1 ¶¶ 17-20, *doc. 62* at 4.

11. On November 12, 2009, Defendant Martin met with New Mexico Department of Agriculture Inspector Cecilia Owens. *Doc. 48*, Ex. 1 ¶ 21, *doc. 62* at 4.

12. Between November 13-23, 2009, Defendant Martin and Inspector Owens collected records relating the sale of carbofuran from a variety of area suppliers. These records indicated that on two separate occasions, April 20, 2007, and

March 6, 2008, representatives of Don Hackey Farms purchased Furadan LTR, a

pesticide that contains carbofuran. *Doc. 48*, Ex.1 ¶¶ 24-25, *doc. 62* at 5.

13. On December 2, 2009, Defendant Martin and Inspector Owens interviewed Don

Hackey, who confirmed that Plaintiff was the foreman of his farming operation

and had access to the storage area where the pesticides were stored. *Doc. 48*, Ex. 1

¶¶ 26-28, *doc. 62* at 5.

14. In December 2009, Defendant Martin also contacted FMC Corporation, which

manufactures Furadan LTR.  A representative of FMC Corporation informed him

that Furadan LTR contains carbofuran and was available as a tan or off-white

water-based liquid and that pills could be rendered to appear more porous by

exposure to it.  *Doc. 48*, Ex. 1 ¶¶ 29-30, *doc. 62* at 6.

15. In January 2010, at the request of Defendant Martin, United States Food and

Drug Administration (FDA) Special Inspector Mary LaFrance tested a wine

bottle, probiotic vitamins, and hair product provided by Defendant Martin for

testing.  The results of the testing indicated that each of the items was

contaminated with carbofuran.  *Doc. 48*, Ex. 1 ¶¶ 33-35, *doc. 62* at 6.

16. On July 27, 2010, Defendant Martin submitted a proposed statement of facts and

criminal complaint to Deputy District Attorney Nelson J. Goodin, who approved

and signed it.  DDA Nelson then presented the two documents to Magistrate

Judge Oscar Frietze, who determined that probable cause existed to arrest Plaintiff. *Doc. 48*, Ex. 1 ¶¶ 47-49, *doc. 62* at 7.

17. On July 28, 2010, Plaintiff was arrested pursuant to a warrant issued by Magistrate Judge Frietze. *Doc. 48*, Ex. 1 ¶ 50, *doc. 62* at 7.

18. On September 22, 2011, Defendant Martin testified before a grand jury about his investigation of Plaintiff. A true bill was entered. *Doc. 48*, Ex. 1 ¶ 52, *doc. 62* at 8.

## IV.   ANALYSIS

Plaintiff seeks to hold Defendant Martin liable for what he contends is his legally actionable misconduct during the course his investigation of the alleged poisoning of Defendants Gomez and Armendariz.  He contends that Defendant Martin's affidavit in support of Plaintiff's arrest warrant contains both material omissions and misrepresentations that, if corrected, would vitiate probable cause.  He also contends that Defendant Martin falsely testified before the grand jury about the results of his investigation in order to implicate Plaintiff. *See generally doc. 1.*  Defendant Martin seeks qualified immunity on the basis that his affidavit, even excising the alleged misrepresentations and including all omitted facts, still provides a sufficient basis on which to determine he had probable cause to arrest Plaintiff. Further, he argues that Plaintiff has not presented any evidence that indicates that Defendant Martin intentionally misled, or spoke with reckless disregard when testifying before, the grand jury. *Doc. 48* at 12-16.  The Court, having reviewed the evidence before it, finds that

Defendant Martin is entitled to qualified immunity as to Plaintiff's malicious

prosecution, false arrest, and false imprisonment causes of action regarding his

probable cause affidavit, and absolute immunity as to his grand jury testimony.

**A.      Defendant Martin is Entitled to Immunity as to Plaintiff's Malicious Prosecution Claim**

Plaintiff contends that Defendant Martin violated his constitutional right to be

free from malicious prosecution when he knowingly pursued a criminal action for

attempted murder against Plaintiff in the absence of probable cause.  Plaintiff claims

that Defendant Martin's probable cause affidavit selectively recounted Defendants

Gomez and Armendariz's medical records regarding the alleged poisoning incidents in

question in order to make their symptoms appear closer to those of carbofuran

poisoning.[1] *Doc. 62* at 24-25. He also contends that Defendant Martin failed to take into

account Defendants Gomez and Armendariz's lack of credibility in making his probable

cause determination. Plaintiff argues that the facts demonstrate that Defendant Martin

acted knowingly, or with reckless indifference, in excluding material facts and

including material misrepresentations in the probable cause affidavit. *Id.* at 27.  He also

argues that Defendant Martin misrepresented the facts of his investigation to the grand

---

[1] The omitted facts include: 1) Defendants' failure to allege that they were poisoned by drinking tainted wine at the time they received medical treatment for their illnesses; 2) the physicians treating Defendants did not diagnose carbofuran poisoning; and 3) the physicians treating Defendants diagnosed them with other illnesses.

jury.  As a result of these misrepresentations, Plaintiff contends that he was wrongfully

arrested and prosecuted for attempted murder.

Demonstrating a lack of probable cause is an essential element of proving the tort

of malicious prosecution.  *Taylor v. Meacham*, 82 F.3d 1556, 1561-62 (10th Cir. 1996).

"Probable cause for an arrest warrant is established by demonstrating a substantial

probability that a crime has been committed and that a specific individual committed

the crime." *Wolford v. Lasater,* 78 F.3d 484, 489 (10th Cir. 1996).   An affiant who either

"knowingly, or with reckless disregard for the truth, include[s] false statements in the

[probable cause] affidavit" or "knowingly or recklessly omit[s] information which, if

included, would have vitiated probable cause" violates the Fourth Amendment. *Id.* The

Tenth Circuit recently explained the procedure for evaluating a probable cause affidavit

that allegedly contains misrepresentations or omissions in *Kerns v. Bader*:

> Procedurally we approach the probable cause question this way. Where
> false statements are alleged to have been included in an arrest warrant
> affidavit or grand jury testimony, probable cause is determined by setting
> aside the false information and reviewing the remaining truthful facts.
> Similarly, where true information has been allegedly and unlawfully
> omitted from an affidavit or grand jury proceeding, the existence of
> probable cause is determined by examining the affidavit [or proceedings]
> as if the omitted information had been included and inquiring if the
> affidavit [or proceedings] would still have given rise to probable cause.

663 F.3d 1173, 1188 (10th Cir. 2011) (citations and quotations omitted). Where, as

here, a defendant asserts the defense of qualified immunity, a plaintiff may

overcome the defense only through "a substantial showing of deliberate

11

falsehood or reckless disregard for truth." *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990). In order to make this showing, a plaintiff must (1) demonstrate an affirmative showing of dishonesty; and (2) establish that, but for the dishonesty, the search warrant would not have been issued. *Id.*

### i.    *The Probable Cause Affidavit*

Plaintiff's main contention with the probable cause affidavit is that Defendant Martin did not accurately convey the contents of Defendants Gomez and Armendariz's medical records relating to the alleged poisoning events. Plaintiff asserts that the affidavit contains the following inaccuracies:

- Defendant Armendariz did not report, nor did she actually experience, symptoms of carbofuran poisoning on January 10, 2008, but Defendant Martin reported that she did;

- Defendant Gomez did not experience the range of symptoms reported by Defendant Martin during the February 7, 15, and March 6, 2008 incidents, but instead only nausea and abdominal pain;

- Defendant Gomez's illness for which she was hospitalized on February 23, 2008, not only did not accord with carbofuran poisoning, but her treatment records also do not indicate that her treating physicians believed she had been poisoned, yet Defendant Martin reported her symptoms of being indicative of carbofuran poisoning and specifically omitted any mention of her mental health issues;

12

- Neither Defendants Gomez or Armendariz reported that they felt that they had been poisoned at the times they received treatment for their illnesses;

- After providing a list of symptoms of carbofuran poisoning, Defendant Martin affirmatively stated at the end of the probable cause affidavit that Defendants Gomez and Armendariz had experienced "all or most" of those symptoms.

*Doc. 62* at 18-23.  Plaintiff's description of the probable cause affidavit, however, is somewhat incomplete.  For example, in relating the alleged poisoning incident on January 10, 2008, the affidavit states that Defendant Armendariz was taken to the hospital with vomiting and abdominal pain, and that she was ultimately diagnosed with "a small gallbladder infection," *not* carbofuran poisoning. *Doc. 48*, Ex. O at 3.  As to the February 23, 2008 incident, the probable cause affidavit states that Defendant Gomez was treated for a potential stroke and anxiety.[2]  *Doc. 48*, Ex. O at 3, 4.  Plaintiff complains that Defendant Martin should have included the fact that Defendants Gomez and Armendariz did not report their suspicion of poisoning to their treating physicians. However this "omitted" fact seems hardly relevant in light of the fact that when Defendant Armendariz sought treatment on January 10 there had been no prior instances of mysterious illness to give rise to a suspicion of poisoning. Defendant Gomez was also so severely ill when she sought treatment that she was intubated en

---

[2] The other poisoning events on February 7, 15, and March 6, 2008 did not result in hospitalizations and therefore there are no third party records to compare against Defendant Gomez's account of those incidents.

route to the hospital and subjected to emergency angiogram before she was physically able to relay any such suspicion to her doctors. *Doc. 62* at 18-19, *doc. 48*, Ex. M at 2, 5, 9. It is true that Defendant Gomez did not, later in her treatment on February 24 or 25, report any suspicion of poisoning, but she did state that she believed her husband was trying to hurt her. *Doc. 48*, Ex. M at 4. Further, her treatment record reflects that her heart rate increased when her husband was present. *Id.* Finally, while Plaintiff contends that Defendant Martin should have included any discrepancies between Defendants Gomez and Armendariz's illnesses and the symptoms of carbofuran poisoning in the probable cause affidavit, the affidavit provides a full list of symptoms of carbofuran poisoning, including those that neither Defendant Gomez nor Defendant Armendariz reported, such as pinpoint pupils, convulsions, and excessive salivation.[3] *Doc. 48*, Ex. O, *doc. 62* at 22-23. Thus, Defendant Martin's affidavit was not misleading, let alone deliberately false or recklessly inaccurate, as the judge reviewing the affidavit could simply compare the list of carbofuran poisoning symptoms to those suffered by Defendants Gomez and Armendariz.

---

[3] While Plaintiff suggests that Defendant Gomez's apparent diagnosis of pneumonia eliminates the possibility that she suffered from carbofuran poisoning, (*see doc. 62* at 22) the probable cause affidavit notes that one symptom of carbofuran poisoning is "excessive respiratory secretions (**pneumonia**-like fluid build up in lungs)". *Doc. 48*, ex. O at 5 (emphasis added). Plaintiff's medical records from February 23, 2008, further note that she presented with "pneumonia, organism unspecified", her sputum test was normal, but that she was producing "copious amounts of thick mucus." *Doc. 48*, Ex. M at 1-2. Plaintiff also appears to contend that Defendant Gomez's illness was purely a result of her anxiety. *Doc. 62* at 21-22. But Defendant Gomez was treated for anxiety because she self-diagnosed her symptoms as an anxiety attack, a fact that does not preclude the possibility that she was also poisoned. *Doc. 48*, Ex. M at 2.

Plaintiff also argues that Defendant Martin turned a blind eye to Defendants Gomez and Armendariz's credibility issues during the course of his investigation. According to Plaintiff, Defendant Martin should have treated Defendants Gomez and Armendariz's claims as totally unreliable because Defendant Gomez and Plaintiff were in the process of an acrimonious divorce and Defendant Gomez's conduct and inconsistent accounts of being poisoned indicated that she was being deceptive. *Doc. 62* at 17-18. Worse, according to Plaintiff, Defendant Martin appears to have never considered that Defendant Gomez could have herself added the carbofuran to the contaminated items in question, both because there was significant delay between the alleged poisoning incidents and when Defendant Gomez ultimately provided the items to Defendant Martin, as well as because there was no way to determine who placed the poison in the contaminated items in question or when it was done. *Id.*

The first flaw with Plaintiff's argument is that "[a]bsent special circumstances suggesting that a victim-witness is not credible, … a police officer [is] permitted to assume he is dealing with a trustworthy person." *Munday v. Johnson*, 257 Fed. Appx. 126, 131 (10th Cir. 2007) (citing *United States v. Patane*, 304 F.3d 1013, 1017 (10th Cir. 2002) (*reversed on other grounds*, 542 U.S. 630 (2004)). Plaintiff may argue that the "acrimonious divorce" is a "special circumstance" which would make this case fall outside the general rule. However, the Tenth Circuit has already addressed and rejected a similar argument. In *Patane*, a man was arrested for violating a domestic

15

violence restraining order based on the statements of his domestic partner.  304 F.3d at 1014-15.  In granting the subsequent suppression motion, the district court ruled that "no probable cause existed [for the] arrest … based on its view that domestic disputes often involve 'claims and counterclaims ... thrown between people who have separated some sort of an intimate relationship,' and therefore that uncorroborated allegations arising from such disputes are 'just inadequate' to establish probable cause." *Id*. at 1016. The district court then described a list of unexplored avenues of corroboration.  *Id*.  The Tenth Circuit strongly repudiated the district court's reasoning saying:  "We reject any suggestion that victims of domestic violence are unreliable witnesses whose testimony cannot establish probable cause absent independent corroboration. …  We find no basis for the suggestion that domestic violence victims are undeserving of the presumption of veracity accorded other victim-witnesses."  *Id*. at 1016-17.  If the fact that a victim-witness has sought and received a domestic restraining order does not prevent an officer from relying on the statements of that victim-witness, it would follow that neither would the fact that the victim-witness is in divorce proceedings with the target of her allegations.

Alternatively, even assuming that the credibility concerns regarding Defendants Gomez and Armendariz were so significant that their statements should have been deemed unreliable and not considered, Plaintiff's claim still fails.  In determining whether there is probable cause, the Court only "require[s] more than a bare suspicion

16

… not proof beyond a reasonable doubt or even a preponderance [of evidence]".  *Kerns*, 663 F.3d at 1188; *see also United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011). Under New Mexico law, the elements of attempted murder are the commission of an overt act in furtherance of, and with intent to, commit murder, but failing to complete the act.  NMSA 1978 § 30-28-1.  Attempting to poison a person can be considered an overt act in furtherance of murder.  *See, e.g., State v. Gillette*, 699 P.2d 626 (N.M. Ct. App. 1985).  Even excising the statements of Defendants Gomez and Armendariz would still leave sufficient facts to demonstrate that a "substantial probability existed that the suspect committed the crime." *Kerns*, 663 F.3d at 1188.  Plaintiff does not dispute the following facts which would remain in the probable cause affidavit: that Defendants Gomez and Armendariz did fall ill on several occasions, that at the times they fell ill they complained of nausea and abdominal pain, that Plaintiff's son saw Plaintiff putting a pill in a beverage that Plaintiff then gave to Defendant Gomez, that Plaintiff's son overheard his father discussing poisoning his mother, that Plaintiff had access to carbofuran which was a highly regulated and controlled substance, that the items allegedly contaminated with carbofuran (a wine bottle, the hair product, and the probiotic pills) in fact tested positive for it on two separate occasions, and that carbofuran poisoning matched significant symptons of Gomez' and Armendariz' illnesses.  With only these facts, Defendant Martin would have had sufficient facts to establish probable cause that Plaintiff committed attempted murder under New Mexico

17

law.  Therefore, he cannot establish that, but for the omitted facts, the search warrant would not have been issued.  Defendant Martin is thus entitled to qualified immunity as to Plaintiff's malicious prosecution cause of action.

### ii.    The Grand Jury Testimony

Defendant Martin argues, and Plaintiff appears to concede, that Defendant Martin has absolute immunity from liability for his grand jury testimony under *Rehberg v. Paulk*, 132 S. Ct. 1497 (2012).  *Doc. 48* at 19-20, *doc. 62* at 31-32.  The Court agrees.  Under *Rehberg*, a witness who testifies before a grand jury is entitled to absolute immunity from liability for that testimony, even if that testimony is allegedly false.  *Id.* at 1501-10.  Plaintiff's complaint seeks to hold Defendant Martin liable for his grand jury testimony, which is impermissible under *Rehberg*.  Plaintiff's claim for malicious prosecution arising from Defendant Martin's testimony at the grand jury is therefore dismissed on this basis.

### B.    Defendant Martin is Entitled to Qualified Immunity as to Plaintiff's False Arrest/Imprisonment Claim

Plaintiff also alleges that Defendant Martin is liable for violating his Fourth Amendment right to be free from false arrest and imprisonment. *Doc. 1* at 8-9.  As with malicious prosecution, a § 1983 action for false arrest must demonstrate that the arrest was made in the absence of probable cause. *United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009). Having determined above that the undisputed facts present in his affidavit were sufficient to sustain a finding of probable cause on which to issue an

arrest warrant, Plaintiff cannot sustain this cause of action.  *See Kerns*, 663 F.3d at 1190 (holding that the existence of probable cause to arrest the plaintiff disposed not only of plaintiff's malicious prosecution, but also of his false arrest claim).  Defendant Martin is therefore granted qualified immunity as to this claim as well.

## V.   CONCLUSION

A review of the record in this case demonstrates that the facts contained in the challenged probable cause affidavit were sufficient to sustain a finding of probable cause. For that reason, Plaintiff's claims for malicious prosecution and false arrest/imprisonment necessarily fail.   Defendant Martin's motion for summary judgment on the basis of qualified immunity is GRANTED. Plaintiff's action as against Defendant Martin is DISMISSED with PREJUDICE.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**